THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **JAMES ETHEREDGE,** | : |
| | : |
| **Plaintiff,** | : |
| **v.** | : **3:11-CV-2330** |
| | : **(JUDGE MARIANI)** |
| **M.L. HENRY,** *et al.,* | : |
| | : |
| **Defendants.** | : |

## MEMORANDUM OPINION

### I. INTRODUCTION

Plaintiff's sole remaining claim in this 42 U.S.C. § 1983 action is that Defendants

discriminated against him due to his sexual orientation and, thereby, violated the Equal

Protection Clause of the Fourteenth Amendment. (Docs. 46 & 47). Presently before the

Court is Defendants' Motion for Summary Judgment (Doc. 65). For the reasons set forth

below, the Court will grant Defendants' Motion.

### II. FACTUAL BACKGROUND

#### A. Statement of Undisputed Facts

Plaintiff James Etheredge is a homosexual police officer with the Pennsylvania State

Police ("PSP"). (*See* Defs.' Statement of Facts ("DSOF"), Doc. 66, at ¶¶ 1, 10). At all times

relevant to the present matter, Plaintiff was assigned to "Troop T - Pocono." (*Id.* at ¶ 3).

Defendants were Plaintiff's supervisors. (*See id.* at ¶¶ 6-9, 12-13).The PSP is a paramilitary

organization. (*Id.* at ¶ 2). Its employees are expected to follow the PSP's chain of command and obey the orders of superior officers. (*Id.*).

From February 2009 to April 2011, Defendant M.L. Henry was the Commander of Troop T. (*Id.* at ¶ 6). In July 2008, Defendant Gerald Brahl became Eastern Section Commander of Troop T. (*Id.* at ¶ 8). Between February 2009 and April 2011, Brahl was a subordinate of Henry. (*Id.* at ¶ 9). From March 2009 to January 2010, Defendant Judy Holly-Storms was Sergeant and Station Commander of Troop T. (*Id.* at ¶ 12). As Station Commander, Holly-Storms was a subordinate of Defendants Henry and Brahl. (*Id.* at ¶ 13).

On September 17, 2006, Etheredge suffered a work-related injury, which kept him out of work until February 2012. (*Id.* at ¶¶ 14-15). Between March 2008 and November 2009, Plaintiff was ordered to return to work. (*Id.* at ¶¶ 16-24). Despite two Return to Work Orders, dated March 20, 2008 and August 6, 2009, Plaintiff remained on leave as he was later determined to be medically unable to work. (*Id.* at ¶¶ 19, 23).

On November 9, 2009, Lieutenant Colonel John R. Brown sent Defendant Henry a memorandum directing him to order Etheredge to return to work. (Henry Decl., Doc. 67-4, Attach. B). Henry received the memorandum on November 12, 2009 and issued an order for Etheredge to return to work. (*Id.*; DSOF at ¶¶ 24-25, 36).[1] Henry instructed Brahl to have troopers serve Plaintiff with the Return to Work Order and to have him sign it. (*Id.* at ¶ 29).

---

[1] Plaintiff denies Paragraph 25 of Defendants' Statement of Facts. (Pl.'s Counterstatement of Facts ("PCSOF"), Doc. 73, at ¶ 25). Although the parties dispute who made the decision behind the November 9, 2009 Return to Work Order (*id.* at ¶ 26; DSOF at ¶ 26), Plaintiff does not deny that Henry issued the Order.

2

Because the troopers had trouble reaching Etheredge, Henry directed them to continue attempting to serve Plaintiff, on every shift, until service was effected. (*Id*. at ¶ 28).

Holly-Storms received Henry's orders and passed them along to her subordinates. (DSOF at ¶¶ 30-31). On the night of November 18, 2009, Troopers Thomas Getz and Terry Blatt attempted to serve Etheredge at his residence. (*Id*. at ¶¶ 32-33). During the attempt, Etheredge fell in his home and sustained an injury requiring hospitalization. (*Id*. at ¶¶ 34-35). While in the hospital, Plaintiff was served with the Return to Work Order, which he signed. (*Id*. at ¶ 35).

Under PSP policy, troopers on medical leave for a long-term illness or disability are required to be visited on a biweekly basis. (*Id*. at ¶ 43). Pursuant to this policy, the PSP periodically visited Plaintiff. (*Id*. at ¶ 46). Holly-Storms was responsible for ensuring that troopers visited Etheredge, and other officers in Troop T who were on medical leave. (*Id*. at ¶ 47). Holly-Storms would personally check in with Etheredge by calling him and by visiting his residence. (*Id*. at ¶¶ 49-50, 53).[2]

In November 2009, Holly-Storms attempted to contact Etheredge by phone on six or seven occasions but was unable to reach him. (*Id*. at ¶ 56).[3] Although Holly-Storms does not believe that Plaintiff was intentionally avoiding contact with her or the PSP (*id*. at ¶ 58),

---

[2] Plaintiff denies Paragraphs 46, 47, 50 and 53 of Defendants' Statement of Facts. (PCSOF at ¶¶ 46-47, 50-53). However, Plaintiff does not dispute that: (1) troopers periodically visited him, (2) Holly-Storms was tasked with ensuring compliance with the PSP's policy of biweekly visits, and (3) she personally attempted to check in with Plaintiff by phone and by visiting his home.

[3] Plaintiff denies Paragraph 56 of Defendants' Statement of Facts. However, Plaintiff does not dispute that Holly-Storms called him in November 2009. (PCSOF at ¶ 56). Instead, Etheredge simply states that he is unaware of any records of the calls. (*Id*.).

3

she testified during her deposition that she experienced difficulty contacting Etheredge. (Holly-Storms Dep., Doc. 73-3, Ex. F, at 24:14-23). Part of this difficulty seems to stem from the fact that, due to his financial shortcomings at the time, Etheredge would only accept phone calls at night and on weekends, when he would not have to expend minutes on his cell phone plan. (Etheredge Dep., Doc. 73-1, at 87:6-13, 117:19-118:7; Taylor Dep., Doc. 73-2, Ex. B, at 21:5-9). Because troopers were unable to reach Etheredge during the day, Defendant Henry ordered them to attempt to meet with Plaintiff during evening and night shifts. (DSOF at ¶ 59).[4]

Between March 2009 and January 2010, Holly-Storms met with a Magisterial District Judge in Plaintiff's hometown on three or four occasions. (*Id.* at ¶ 63). During the meetings, Holly-Storms and the Judge discussed Etheredge. (*Id.* at ¶ 64). Before her first visit with Plaintiff, Holly-Storms met with the Judge and asked him for directions to Etheredge's residence. (*Id.*; Holly-Storms Dep. at 49:8-50:3).[5]

Holly-Storms was also responsible for checking in on Trooper Stephen Boettger. (*See* DSOF at ¶¶ 47, 68). Boettger, like Plaintiff, was a trooper in Troop T. (*Id.* at ¶ 68). On October 30, 2005, Boettger was injured on the job. (*Id.* at ¶ 70). On November 1, 2005, Boettger, a heterosexual male, went on leave. (*Id.* at ¶¶ 69, 71).

---

[4] Plaintiff denies Paragraph 59 of Defendants' Statement of Facts. (PCSOF at ¶ 59). However, Plaintiff does not dispute that (1) troopers were unable to meet with him during the day shift and (2) Henry gave orders for troopers to attempt to contact him during the evening and night shifts.

[5] Plaintiff denies Paragraphs 63 and 64 of Defendants' Statement of Facts. (PCSOF at ¶¶ 63-64). However, Plaintiff does not dispute that Holly-Storms met with the Magisterial District Judge, spoke with him about Etheredge, and asked for directions to Etheredge's residence.

4

## B. Etheredge's Allegations of Discrimination

Plaintiff's primary basis for his sexual orientation discrimination claim is that Defendants allegedly treated Trooper Boettger, who is heterosexual, more favorably than Etheredge, because Etheredge is homosexual. Etheredge relies upon the deposition testimony of Corporal Jeffrey Taylor, now retired. (See Doc. 73-2, Ex. C). In his deposition, Taylor testified that "[t]here's only one difference between Trooper Etheredge and Trooper Boettger . . . . They both worked for me, . . . Jim is a homosexual and Trooper Boettger isn't." (Id. at 24:14-23). According to Taylor, Trooper Boettger was injured on October 31, 2005, when he "hit a deer, cracked the headlamp cover [of his car], and [sustained] a small scuff on the right front fender." (Id. at 11:2-9).

Also according to Taylor, Plaintiff "was involved in two crashes," one on February 14, 2006, and another on September 17, 2006. (Id. at 11:9-24). Taylor testified that the second crash was much more serious than the first: "[h]e was backing up, lost control; totaled the car," and there was "extensive, horrific damage to the car." (Id. at 11:24-12:5). After their respective car accidents, both troopers received Heart and Lung benefits.[6] (Id. at 12:9-16). By the time Plaintiff went off-duty, Boettger "had been off for . . . almost 11 months or 10 months" longer. In addition to being treated by their own doctors, both troopers underwent

---

[6] Pennsylvania's Heart and Lung Act, 53 Pa. Stat. Ann. § 637, provides benefits "to public employees engaged primarily in police work, firefighting, or other jobs involving public safety. The Act was created to ensure that, if these employees were injured or otherwise disabled in the course of carrying out their hazardous duties, they would be guaranteed continued full income until their return to duty." City of Erie v. W.C.A.B. (Annunziata), 575 Pa. 594, 602, 838 A.2d 598, 603 (2003) (quoting Cunningham v. Pennsylvania State Police, 510 Pa. 74, 507 A.2d 40, 43 (1986)).

5

independent medical exams ("IME") which were reviewed by the State Police Medical Officer ("SPMO"). (*Id*. at 12:24-13:6).

In Boettger's case, "[h]is doctor said he cannot return to work. The SPMO said he can return to work, [and] the IME doctor said he can return to work." (*Id*. at 14:11-19). In Plaintiff's case, "[he] had the same medical documentation that Trooper Boettger did. Family doctor said don't return to work, SPMO said return, IME said return." (*Id*. at 15:11-15).

Although Plaintiff's treating physicians did not recommend he return to work, whereas the SPMO and IME did (the same scenario as Trooper Boettger), Defendants "didn't listen to his family doctor, they forced him . . . to use his sick and annual, [and] they forced him into a no pay situation." (*Id*. at 15:6-11). In contrast, Defendants "never forced [Boettger] on sick leave, annual leave, . . . they haven't forced him to do anything, [and] they've kept him on heart and lung." (*Id*. at 16:2-5).

In addition, Etheredge contends that Defendants took several other adverse actions against him, but not Boettger, including (1) running NCIC/CLEAN checks[7] on Plaintiff's

---

[7] According to the PSP website,

> The Commonwealth Law Enforcement Assistance Network (CLEAN) is used by the Commonwealth's criminal justice agencies to access driver license and motor vehicle information, state criminal history record information maintained in the Pennsylvania State Police Central Repository, the Commonwealth's central registry for Protection from Abuse orders, "hot" (stolen and wanted) files, law enforcement messaging capabilities, and a host of other services. CLEAN is Pennsylvania's conduit to NCIC, the FBI's National Crime Information Center, and to Nlets, the International Justice and Public Safety Information Sharing Network.

*About Clean*, http://www.portal.state.pa.us/portal/server.pt/community/psp/4451/hide_-_psp_about_clean /489829.

6

vehicles (PCSOF at ¶ 55); (2) instigating "numerous" code enforcement warnings for "petty" building code violations (Etheredge Dep. at 82:1-16); (3) leaving Etheredge "dozens of threatening, antagonistic messages" (id. at 85:10-13); (4) denying that there were light-duty positions for Plaintiff to return to, despite allowing other troopers to work such positions (id. at 93:10-94:16); and (5) "pre-engineer[ing]" an investigation into a complaint Plaintiff filed such that the investigation would "find that there was no misconduct affecting plaintiff." (Br. in Opp. at 7).

## III. STANDARD OF REVIEW

Through summary adjudication, the court may dispose of those claims that do not present a "genuine issue as to any material fact." Fed. R. Civ. P. 56(a). Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); Turner v. Schering-Plough Corp., 901 F.2d 335, 340 (3d Cir. 1990). "As to materiality, . . . [o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).

The party moving for summary judgment bears the burden of showing the absence of a genuine issue as to any material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). Once such a showing has been made, the non-

7

moving party must offer specific facts contradicting those averred by the movant to establish a genuine issue of material fact. *Lujan v. Nat'l Wildlife Fed'n,* 497 U.S. 871, 888, 110 S. Ct. 3177, 111 L. Ed. 2d 695 (1990). "Inferences should be drawn in the light most favorable to the non-moving party, and where the non-moving party's evidence contradicts the movant's, then the non-movant's must be taken as true." *Big Apple BMW, Inc. v. BMW of N. Am., Inc.,* 974 F.2d 1358, 1363 (3d Cir. 1992), *cert. denied* 507 U.S. 912, 113 S. Ct. 1262, 122 L. Ed. 2d 659 (1993).

## IV. ANALYSIS

To establish a *prima facie* case under 42 U.S.C. § 1983, a plaintiff must demonstrate that: (1) he was deprived of a federal right; and (2) the person who deprived him of that right acted under color of state law. *Burrella v. City of Philadelphia*, 501 F.3d 134, 139 (3d Cir. 2007). Section 1983 is not an independent source of substantive rights, but merely "provides a remedy for deprivations of rights established elsewhere in the Constitution or federal laws." *Kopec v. Tate*, 361 F.3d 772, 775-76 (3d Cir. 2004).

### A. Sexual Orientation Discrimination

Plaintiff argues that Defendants have discriminated against him based on sexual orientation and, thereby, violated the Equal Protection Clause of the Fourteenth Amendment. The Fourteenth Amendment prohibits a state from "deny[ing] to any person within its jurisdiction the equal protection of the laws," "which is essentially a direction that

8

all persons similarly situated should be treated alike." *City of Clerburne v. Clerburne Living Ctr.*, 473 U.S. 432, 439, 105 S. Ct. 3249, 3254, 87 L. Ed. 2d 313 (1985).

Currently, federal courts across the country are confronting claims of sexual orientation discrimination in the context of challenges to state bans on same-sex marriage. *See, e.g., Whitewood v. Wolf*, 992 F. Supp. 2d 410, 424-25 (M.D. Pa. 2014); *Bostic v. Rainey*, 970 F. Supp. 2d 456, 480-82 (E.D. Va. 2014), *aff'd sub nom. Bostic v. Schaefer*, 760 F.3d 352 (4th Cir. 2014), *cert. denied*, 135 S. Ct. 308 (2014); *Latta v. Otter*, 19 F.Supp.3d 1054, 1072-76 (D. Idaho), *aff'd* 771 F.3d 456 (9th Cir. 2014). As Judge John E. Jones recently observed in *Whitewood*, "[t]he Third Circuit has never discoursed on the appropriate level of scrutiny to be applied to classifications based on sexual orientation, nor has the Supreme Court rendered an explicit holding on that point." 992 F. Supp. 2d at 425. Other courts of appeal are divided on the issue. *Compare Latta*, 771 F.3d at 468 ("In *SmithKline*, we held that classifications on the basis of sexual orientation are subject to heightened scrutiny.") (citing *SmithKline Beecham Corp. v. Abbott Labs.*, 740 F.3d 471, 480-81 (9th Cir. 2014)) and *Windsor v. United States*, 699 F.3d 169, 185 (2d Cir. 2012) (finding that "homosexuals compose a class that is subject to heightened scrutiny") *with DeBoer v. Snyder*, 772 F.3d 388, 413 (6th Cir. 2014) (noting "[o]ur precedents say that

rational basis review applies to sexual-orientation classifications"), *cert. granted sub nom. Obergefell v. Hodges*, 135 S. Ct. 1039 (2015).[8]

In determining whether a government classification warrants increased scrutiny, the Supreme Court considers certain "indicia of suspectness," including whether the group: (1) has endured a "history of purposeful unequal treatment," *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 28, 93 S. Ct. 1278, 1294, 36 L. Ed. 2d 16 (1973); (2) possesses a defining characteristic that "frequently bears no relation to ability to perform or contribute to society," *Cleburne*, 473 U.S. at 440-41 (quoting *Frontiero v. Richardson*, 411 U.S. 677, 686, 93 S. Ct. 1764, 1770, 36 L. Ed. 2d 583 (1973) (plurality opinion)); (3) exhibits "obvious, immutable, or distinguishing characteristics that define them as a discrete group[,]" *Bowen v. Gilliard*, 483 U.S. 587, 602, 107 S. Ct. 3008, 3018, 97 L. Ed. 2d 485 (1987) (citation and internal quotation marks omitted); and (4) has been "relegated to such a position of political powerlessness as to command extraordinary protection from the majoritarian political process." *Rodriguez*, 411 U.S. at 28.

In the instant case, however, it is unnecessary to predict how the Supreme Court will rule on such matters of constitutional law, because, after careful review of the summary judgment record, this Court is constrained to observe that, despite Etheredge's allegations of sexual orientation discrimination, he has failed to come forward with evidence that shows

---

[8] The Supreme Court has granted a petition for writ of certiorari to resolve the question of whether "the Fourteenth Amendment require[s] a state to license marriage between two people of the same sex" and may in so doing resolve the issue of what the level of scrutiny is appropriate in considering Equal Protection Clause claims of sexual orientation discrimination. *See Obergefell*, 135 S. Ct. at 1040.

directly or by reasonable inference that the actions of the Defendants of which he complains were based in any way, no matter how slight, on his sexual orientation. Moreover, Defendants do not attempt to argue that there is a legitimate Equal Protection basis for discriminating against homosexuals; they merely deny as a factual matter that they engaged in sexual-orientation discrimination or that they treated Plaintiff differently from other officers, for this or any other reason. (Br. in Supp. at 14-19). Thus, because, at the most basic level, the summary judgment record does not support Plaintiff's factual claims of discrimination, his claims must fail regardless of the level of scrutiny applied.

## B. Application of the Summary Judgment Standard

As a preliminary matter, the Court observes that Plaintiff's submissions in response to Defendants' Motion for Summary Judgment were woefully deficient. It is difficult for the Court to discern the precise bases of Plaintiff's claims.[9] Etheredge offers a host of allegations of mistreatment most of which fall into one of two categories. First, some of Plaintiff's claims are made without any evidence indicating that Defendants, as opposed to the PSP more generally or other police officers, were personally involved in the adverse actions allegedly taken against Etheredge. Second, Etheredge sets forth other accusations without any evidence demonstrating a factual nexus between his sexual orientation and the alleged misconduct.

---

[9] For instance, despite the fact that the Court previously "dismiss[ed] all factual allegations arising before March 2008" (Doc. 46 at 14), Plaintiff discusses pre-March 2008 conduct in his Brief. (Doc. 74 at 2-3). Further, Etheredge offers arguments relating to his First Amendment retaliation claim notwithstanding the fact that this claim was also previously dismissed. (*Id.* at 4; Doc. 35 at 3).

Plaintiff's primary argument is that he was treated less favorably than Boettger, a heterosexual trooper who was on medical leave around the same time as Etheredge. Among Etheredge's several allegations, three main claims emerge. Plaintiff posits that Defendants discriminated against him by (1) temporarily denying him pay and benefits, (2) issuing Return to Work Orders, and (3) visiting his home.

### 1. Lost Pay and Benefits

Etheredge argues that while on medical leave he, unlike Boettger, was forced to use his sick and annual leave and eventually lost benefits and pay. (Br. in Opp. at 3-4). In support of this assertion, Etheredge relies upon Taylor's deposition testimony. (See PCSOF at ¶ 75; Taylor Dep., Doc. 73-2, Ex. C). Taylor testified that he "was the person for our station who would go out and do the visits of our people on disability, extended sick leave or heart and lung type injuries. Trooper Boettger was on them and so was Trooper Etheredge and I was the one tasked with going to do the visits." (Taylor Dep. at 9:2-10:19). He described the differential treatment Etheredge and Boettger allegedly received.

> What they subsequently did to Trooper Etheredge was they didn't listen to his family doctor, they forced him . . . to use his sick and annual time. Upon use – finishing his sick and annual, they forced him into a no pay situation. He had the same medical documentation that Trooper Boettger did. Family doctor said don't return to work, SPMO said return, IME said return. . . . For Trooper Etheredge, they threw him into the use your sick and annual, when that's done you're not getting paid. For . . . Trooper Boettger[,] [he] still has not been returned to work, and he's been ordered to return to work. . . . They never forced him on sick leave, annual leave, . . . they haven't forced him to do anything, they've kept him on heart and lung.

(Id. at 15:5-16:5).

12

Defendants contend Plaintiff's claims must fail since Etheredge cannot demonstrate that they were personally involved in any of discriminatory actions alleged. (Br. in Supp. at 8-13). "Personal involvement can be shown through allegations of personal direction or of actual knowledge and acquiescence." *Argueta v. United States Immigration and Customs Enforcement*, 643 F.3d 60, 72 (3d Cir. 2011).

Here, Plaintiff fails to show that Defendants were involved in having "his benefits and pay unilaterally frozen under the purported authority of the PSP's lawyers[.]" (Br. in Opp. at 3). The Court is unaware of any record evidence indicating that Defendants played a role, by either directing or acquiescing in, the temporary termination of Plaintiff's benefits or pay. In his Brief in Opposition, Etheredge argues that he "was informed that his Heart and Lung benefits (wage loss) had also been *cut off by the PSP*." (Doc. 74 at 4 (emphasis added)). There is no suggestion that a specific person terminated his benefits. Similarly, Taylor stated in his deposition testimony that "they" treated Boettger and Etheredge differently. (Doc. 73-2, Ex. B, at 15:5-16:5). However, Taylor does not specify to whom "they" refers. At one point, Taylor testified, "I mean there – there were things – *they* did put him in a bad spot – or *the State Police* put him in a bad spot." (*Id*. at 21:9-12 (emphasis added)). Thus, Taylor appears to refer to the PSP generally, rather than any of the named Defendants specifically.

Likewise, during Etheredge's deposition, he repeatedly stated that "they" forced him to expend his sick and annual leave (*see, e.g.*, Doc. 73-1, Ex. A,  at 94:24-97:3), and ultimately offered that it was the "head of Human Resources," "Kim Studenroth," who made

the decision that caused him to use his sick and annual leave, which is set out in the

following exchange:

> **Q.** You keep saying they took your leave. Who do you mean? Who made the decision to take your leave?
>
> **A.** I assume it was – from what I was told, it was Kim Studenroth, the head of Human Resources.
>
> **Q.** Okay. Do you have any idea who administers Heart and Lung benefits for the Commonwealth?
>
> **A.** I don't know exactly who the program administrator is. In fact, I thought I was told it was a federal program, but I'm not so sure even [of] that.

(*Id.* at 97:4-12).

Here, Etheredge's testimony places responsibility on Kim Studenroth, who

Etheredge identified as "head" of Human Resources, rather on any of the named

Defendants for allegedly forcing him use to his sick and annual leave. Further, as the

deposition testimony quoted above shows, the Plaintiff stated he did not know who

administers the Heart and Lung benefit program for the Commonwealth.

Thus, Etheredge cannot maintain a claim against Defendants based on his alleged

lost pay and benefits, since he produces no evidence demonstrating that Defendants played

a role in the deprivation. Moreover, Etheredge's own testimony presents no assertions of

fact which would link his alleged lost pay and benefits to his sexual orientation.

### 2. Return to Work Orders

Next, Etheredge asserts that Defendants discriminated against him (1) by ordering him to return to work and (2) in the manner in which the Return to Work Orders were executed. (Br. in Opp. 3-4, 6-8). First, Plaintiff contends that Defendants discriminated against him by ordering him to return to work despite the fact that his family doctor determined that he was medically unable to work. However, this argument fails as a matter of law for at least two reasons. One, it is undisputed that Boettger was treated in the same manner. As Taylor, whose testimony Plaintiff relies upon, stated during his deposition, Etheredge "had the same medical documentation that Trooper Boettger did. Family doctor said don't return to work, SPMO said return, IME said return." (Doc. 73-2, Ex. B, at 15:11-15). Like Etheredge, Boettger was also ordered to return to work. (*Id.* at 15:24-25).

Second, there is no evidence of record demonstrating that Defendants made the decisions to order Etheredge to return to work. The record reveals that the PSP ordered Plaintiff to return to work on three occasions: March 20, 2008, August 6, 2009, and November 9, 2009. (DSOF at ¶¶ 16, 20, 24).[10] It is undisputed that the March 20, 2008 and the August 9, 2009 Return to Work Orders were not issued by Defendants. (*See id.* at ¶¶ 17-18, 22; PCSOF at ¶¶ 12-24). Specifically, Plaintiff admits Defendants' statements that

---

[10] In his Brief, Plaintiff asserts that he was "repeatedly request[ed] (4 to 5 times or more)" to return to work, including on December 18, 2009. (Br. in Opp. at 4, 7). However, there is no evidence of record that suggests Etheredge was ordered to return to work aside from the Orders dated March 20, 2008, August 6, 2009, and November 9, 2009.

15

the "March 20, 2008 Return to Work Order was issued by Captain Rodney Patterson," and "Lieutenant Richard L. Dressler II was responsible for ordering Plaintiff back to work on August 6, 2009." (*Id.*).

Etheredge attempts to create an issue of fact as to who was responsible for ordering Plaintiff back to work on November 9, 2009. According to Defendants, "Defendant Henry issued the November 9, 2009 Return to Work Order based on a command he was given from his supervisor, Lieutenant Colonel John R. Brown." (DSOF at ¶ 25). In support of their assertion, Defendants produce a memorandum from Brown, dated November 9, 2009, ordering Henry to "direct Trooper Etheredge to return to work as stipulated in Enclosure (1)." (Henry Decl. at ¶ 12, Attach. B). Enclosure (1), which Defendants also include, was described as "Sample Correspondence from Captain Martin L. Henry, III, Commanding Officer, Troop T, Highspire, to Trooper James Etheredge, relative to Subject" (the Subject being, "Return to Work"). (*Id.* at Attach. B). Enclosure (1) was a letter Brown provided Henry to aid him in carrying out Brown's order. (*Id.*). It contained the substance of Brown's order with blanks for Henry to fill in specifying when and where Etheredge was to return to work. (*Id.*).

Etheredge denies that Brown made the decision to order him back to work and insists that "[t]he order was Henry's." (PCSOF at ¶¶ 25-26). However, Plaintiff offers no evidence in support of his claim. Instead, Etheredge cites several pages from Holly-Storm's deposition and her interview with the PSP's Internal Affairs Division ("IAD"). (PCSOF at

16

¶ 26). Yet, none of the pages Etheredge cites speak to the issue of whether Henry made the November 9, 2009 Return to Work Order or was simply relaying Brown's orders.[11] When confronted with Brown's memorandum during his deposition, Etheredge agreed with Defendants' counsel's statement that based on the memorandum, "Lieutenant Colonel Brown was ordering M.L. Henry to order you [Etheredge] back to work[.]" (Etheredge Dep. at 56:8-57:18).

Thus, Plaintiff cannot maintain a claim against Defendants based on the issuances of the Return to Work Orders.

Etheredge argues that Defendants discriminated against him in the manner in which they executed the Return to Work Orders. It is undisputed that after troopers were unable to serve Plaintiff, Henry gave instructions for troopers to attempt to serve the Return to Work Order on every shift until service was effectuated. (DSOF at ¶ 28; PCSOF at ¶ 28). Etheredge argues that Defendants conspired to harass him by sending troopers to his residence on the night of November 18, 2009. According to Plaintiff,

> Sometime in the early morning hours of November 18, 2009, plaintiff was awakened by loud and repetitive banging on his door. This was Trooper Getz (accompanied by Trooper Blatt) who was at plaintiff[']s premises to deliver the aforementioned notice in the middle of the night. Getz got back into his patrol car, and, as plaintiff began to descend the stairs inside his house, Getz aimed his patrol car spotlight inside plaintiff's house directly into plaintiff[']s face.

---

[11] At most, Holly-Storms' testimony simply confirmed that the Return to Work Order came down her chain of command and that Henry is above her in the chain of command. Holly-Storms testified that she did not know who "initiated" the Order. (Holly-Storms Dep. at 30:20-31:8). She stated, "I don't recall specifically who the order came from, that would have been received through . . . our station mail through the chain of command." (Id. at 31:4-8).

Plaintiff was literally knocked back by the bright light, which caused him to fall down the stairs resulting in serious injuries. Plaintiff was transported by helicopter to the hospital, and a couple of hours later, while plaintiff was hooked up to oxygen and an intravenous bag, Goetz [sic] and his partner Blatt came into his hospital room and instructed plaintiff to sign for the notice. This incident caused plaintiff serious setbacks in his recovery from his prior injuries, in addition to causing new injuries, and severe psychological turmoil.

(Br. in Opp. at 6 (internal citation omitted)).

Plaintiff posits that the incident was part of a plot by Defendants to harm Etheredge. (*Id.* at 7). He argues that Getz "later admitted that Holly-Storms and Brahl directly put him up to harassing plaintiff." (*Id.*). According to Plaintiff, the fact that he was served in the middle of the night and the fact that Getz "[s]potlight[ed] his house and caus[ed] a life threatening fall" are evidence of disparate treatment. (Br. in Opp. at 11).

The summary judgment record does not support Etheredge's assertions. Etheredge offers no evidence demonstrating that Defendants ordered Getz to spotlight Etheredge's residence. Nor is there evidence indicating that Defendants directed Getz and Blatt to serve Plaintiff while he was in the hospital. According to Getz, he decided to serve Etheredge in the hospital, because he assumed he would be questioned by his superiors if he did not do so. (*See* Getz Dep., Doc. 73-2, Ex. B, at 21:10-14).

Therefore, Plaintiff seeks to hold Defendants responsible for Getz's conduct, and there is no evidence that Defendants were aware of, acquiesced in, or directed Getz to spotlight Plaintiff's residence or to serve him while he was in the hospital. Since respondeat superior liability is unavailable under 42 U.S.C § 1983, Plaintiff cannot maintain a claim

18

against Defendants based on Getz's conduct. See Evancho v. Fisher, 423 F.3d 347, 353 (3d Cir. 2005) (quoting Rode v. Dellarciprete, 845 F.2d 1195, 1207 (3d. Cir. 1988)).

Further, Plaintiff produces no evidence regarding the manner in which other troopers on medical leave were served Return to Work Orders. Although Etheredge argues that it was discriminatory for Defendant Henry to order that troopers attempt to serve Plaintiff on every shift, there is no evidence of record indicating that this was unusual or unwarranted. According to Defendants, the only reason Henry ordered nighttime service was because troopers could not contact Etheredge during the day or evening shifts. (DSOF at ¶ 28). Plaintiff admits that Henry placed this order only after PSP was unable to serve Etheredge during the previous shifts. (PCSOF at ¶ 28).[12]

Finally, Plaintiff asserts Defendants' orders to return to work misrepresented that there was no light-duty work available at Pocono. According to Etheredge, Boettger returned to Pocono doing light-duty work. (Br. in Opp. at 3). In support of this allegation, Plaintiff cites the deposition testimony of Taylor and Holly-Storms. (Id.). Not only does the cited testimony not support Etheredge's allegation, Taylor's testimony actually contradicts it. Taylor testified that Boettger had not returned to work. (Taylor Dep. at 15:20-25).

---

[12] Etheredge denies that he "was difficult to meet with." (PCSOF at ¶ 59). However, he cites no evidence contradicting Defendants' characterization. Further, Etheredge testified during his deposition that before the orders were given for him to be served during the night shift, Holly-Storms called Plaintiff during the day. (Etheredge Dep. at 114:20-23). She then "passed [the Return to Work Order] to a corporal for the evening and, when the corporal couldn't find me [Etheredge] because I wasn't home, [Holly-Storms] then passed it to the midnight troopers." (Id. at 114:23-115:1).

In sum, Plaintiff's various claims of sexual orientation discrimination regarding the Return to Work Orders cannot survive summary judgment.

### 3. Home Visits

Third, Etheredge contends that "Holly-Storms left dozens and dozens of threatening and antagonistic messages on plaintiffs [sic] personal cell phone, home phone, and frequently visited his property during 2009 and on into 2010." (Br. in Opp. at 5). In response, Defendants argue that "[t]o the extent Etheredge alleges Holly-Storms checked on him 'far more frequently and for the purposes of harassment,' Doc. 73, ¶46, via telephone calls and walking around his property, Etheredge cites to no record evidence to support these conclusions." (Reply Br., Doc. 76, at 5-6). According to Etheredge, Holly-Storms only visited Boettger's residence on one occasion. (Etheredge Dep. at 74:12-75:6). However, Plaintiff also stated that Holly-Storms sent Taylor to visit Boettger, who was visited "frequently." (See id. at 78:5-12). Etheredge offers no evidence indicating that the PSP visited him more frequently than Boettger or other heterosexual troopers.

Thus, Plaintiff's claim that Defendants treated Boettger more favorably than Etheredge with regard to home visits cannot withstand summary judgment.

### 4. Other Claims

Etheredge argues that various other actions allegedly taken by Defendants are indicative of sexual orientation discrimination. Plaintiff posits, "upon information and belief[,] Henry pre-engineered the investigation" into a complaint Plaintiff filed against Getz so that

the investigation would "find that there was no misconduct affecting plaintiff." (Br. in Opp. at 7). Etheredge offers no evidence substantiating his belief.

Next, Etheredge contends Holly-Storms ran illegal NCIC/CLEAN checks on Plaintiff's vehicles and instigated a Magisterial District Judge to "trump up" building code violations against him. (Br. in Opp. at 5). According to Holly-Storms, she does not recall conducting NCIC/CLEAN checks on any of Plaintiff's vehicles and denies being aware of any building code violations. (DSOF at ¶¶ 55, 65-66). In response, Plaintiff points to Taylor's deposition testimony. (PCSOF at ¶ 55). Taylor testified that he observed readouts of NCIC/CLEAN checks for Etheredge's vehicles on Holly-Storms' desk. (Taylor Dep. at 23:5-15). He further stated that he spoke with the Magisterial District Judge, knew that Holly-Storms met with him, and "knew that they were looking at his [Etheredge's] cars[.]" (*Id.* at 22:6-23:11). According to Etheredge, after Holly-Storms met with the Judge, he "was plagued by baseless warnings, both written and oral, by Code Enforcement Officer Jerry Allen." (Br. in Opp. at 5).

Etheredge's accusations are insufficient to survive summary judgment. First, Plaintiff fails to put forward evidence demonstrating that the NCIC/CLEAN checks Holly-Storms ran on his vehicles, assuming they occurred, were illegal or that they adversely affected him. Second, Etheredge offers no evidence demonstrating that warnings the Code Enforcement Officer issued to him were baseless, nor is there any evidence to support Etheredge's inferential leap that Holly-Storms can be held responsible for warnings issued by the Code

21

Enforcement Officer. There is no evidence Holly-Storms knew of any building code violations, and the record does not support Etheredge's allegation that Holly-Storms asked either the Judge or the Code Enforcement Officer to "trump up" baseless violations. While it is undisputed that Holly-Storms met with the Magisterial District Judge, there is no evidence linking the Judge to the Code Enforcement Officer. Nor, are there any facts suggesting that the Judge persuaded the Code Enforcement Officer to issue Etheredge frivolous warnings.

Moreover, Etheredge's claims against Holly-Storms must fail because they run contrary to his own deposition testimony. In his Brief, Plaintiff posits that Holly-Storms engaged in a campaign of harassment against him due to his homosexuality. (See Br. in Opp. at 7). In his deposition, in contrast, Etheredge stated that Holly-Storms had—to use Plaintiff's counsel's term—an "obsession" about getting troopers on medical leave back to work, regardless of their sexual orientation. (See Etheredge Dep. at 120:19-121:14). When asked why Holly-Storms said that it was her "life's mission" to get him to return to work, Etheredge did not indicate that she was motivated by homophobia. (Id. at 72:19-73:11). Instead, he stated,

> I don't know. I had no prior dealings with her. I think she was just one of those crazy, bitter type sergeants that just either was trying to put a feather in her cap or was just – she's an odd ball[.] . . . So I think she just had a personal thing or was trying to carry out something on behalf of the department.

(Id. at 73:2-6).

According to Plaintiff, the PSP has "a policy of harassing certain Workers['] Compensation recipients in an effort to force them off Workers['] Compensation i.e., to force

and[/]or intimidate them into compromising their claims." (Br. in Opp. at 4). Pursuant to this policy, in addition to trying to get him to return to work, Etheredge testified that Holly-Storms also sought to get Boettger back to work, as well as Taylor when he was on medical leave. (Etheredge Dep. at 120:11-18; 121:5-12). He testified, "I know she [Holly-Storms] tried to get Boettger [back to work] . . . and then she did have some influence with Jeff Taylor's case and certainly mine." (*Id.* at 120:15-18; *see also* 79:24-80:2 (responding to the question "[d]o you know whether PSP has taken any measures to get Trooper Boettger back to work?" by stating "I've heard that they were still trying to get him back . . . ")).

In fact, Etheredge offered an alternative theory as to why Boettger received differential treatment, one that does not involve sexual orientation discrimination. In his deposition, Plaintiff speculated that Boettger received preferential treatment because "he has a political connection." (*See id.* at 79:24-80:9, 105:3-17). According to Plaintiff, when Holly-Storms sought to get Boettger back to work, Boettger called his lawyer and relied on his political connections to ensure that she would not bother him as she did Etheredge and Taylor. (*See id.* at 76:3-6, 79:24-80:9). In contrast, Etheredge, who is homosexual, and Taylor, who is heterosexual, were both allegedly hounded by Holly-Storms to return from medical leave.

Therefore, Etheredge's own deposition testimony belies his assertion that Holly-Storms discriminated against him due to his sexual orientation.[13]

In sum, Plaintiff has failed to put forth evidence that would allow a reasonable jury to infer that Defendants discriminated against him based on his sexual orientation. Many of the allegations Plaintiff makes are without any factual foundation in the record. Others lack evidence linking Defendants to the alleged misconduct. Finally, Plaintiff has failed to provide evidence demonstrating that similarly situated heterosexuals were treated differently, or that any of the actions of which he complains were motivated, in whole or in part, by hostility toward him because of his sexual orientation. Summary judgment is therefore warranted.

## V. CONCLUSION

For the foregoing reasons, the Court will grant Defendants' Motion for Summary (Doc. 65). A separate Order follows.

Robert D. Mariani
United States District Judge

---

[13] Further, Plaintiff fails to offer evidence of record that Defendants were even aware of Etheredge's sexual orientation prior to the initiation of the instant action. Defendants deny that Brahl knew that Plaintiff was gay at the time of the alleged discrimination. (DSOF at ¶ 10). Etheredge asserts that "they all knew plaintiff was gay." (PCSOF at ¶ 10). Yet, Plaintiff fails to offer evidence in support of this assertion.